IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE AETNA, INC. SECURITIES            :            CIVIL ACTION
LITIGATION                              :            NO. 07-4451
                                        :

O'NEILL, J.                                          JUNE  9th   , 2009

<u>MEMORANDUM</u>

On October 27, 2007, plaintiff Southeastern Pennsylvania Transportation Authority, Inc. (SEPTA), both individually and on behalf of others similarly situated, filed a class action complaint against defendants Aetna, Inc., John W. Rowe, Ronald A. Williams, Alan M. Bennett and Craig R. Callen.

In an Order dated February 29, 2008, I consolidated the class actions filed in this Court and any other similar actions against defendants filed in or transferred into this District and named plaintiff Varma Mutual Pension Insurance Company as lead plaintiff.  Plaintiffs, purchasers of Aetna securities during the period from October 27, 2005 through July 27, 2006, filed a consolidated class action complaint on June 2, 2008 alleging that all defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78 and Rule 10b-5 promulgated thereunder (Count I), 17 C.F.R. § 240.10b-5, that individual defendants Rowe, Williams, Bennett and Callen violated Section 20(a) of the Securities Exchange Act (Count II) and that all defendants violated Section 18 of the Securities Exchange Act (Count III).

Before me now are defendants' motion to dismiss lead plaintiff's consolidated amended class action complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA), plaintiff's response and defendants' reply thereto.

BACKGROUND

Defendant Aetna[1] is a diversified health care benefit company offering traditional and consumer-based health insurance products and related services, including medical, pharmacy, dental, behavioral health, group life, long-term care and disability plans and medical management capabilities.  Plaintiff alleges that Aetna's typical customers include employer groups, individuals, college students, part-time and hourly workers, health plans and government-sponsored plans.

Over the course of the class period, individual defendants Rowe, Williams, Bennett and Callen served in various leadership capacities at Aetna.  Defendant Rowe served as Chairman of Aetna from April 1, 2001 until his retirement on October 1, 2006 and served as President from September 15, 2000 until May 27, 2002 and Chief Executive Officer from September 15, 2000 through February 14, 2006.  Defendant Williams served as President of Aetna from May 27, 2002 through July 24, 2007 and has been Aetna's CEO since February 14, 2006 and Chairman since October 1, 2006.  Defendant Bennett was Senior Vice President and Chief Financial Officer during the class period.  Defendant Callen joined Aetna as Senior Vice President and Head of Strategic Planning and Business Development on April 28, 2004 and maintained that position during the class period.

Plaintiff Varma is a Helsinki, Finland-based pension company that manages mutual funds assets for its members.  Plaintiff alleges that it purchased Aetna securities during the class period.

---

[1]  Aetna is a Pennsylvania corporation that maintains executive offices at 151 Farmington Avenue, Hartford, Connecticut.

I.      Alleged Fraudulent Scheme

Aetna, like other health care companies, uses medical cost ratios (MCR)[2] as a key measure of its profitability and future prospects.  The lower the MCR, i.e., the lower medical costs are relative to premiums, the more profitable Aetna appears to analysts and investors.  A higher MCR signals to the market that an insurer is experiencing higher medical costs that are not being offset by a corresponding increase in premiums, thereby making the business less profitable.

Plaintiff asserts that since at least April 2005, Aetna had been telling investors that it practices "disciplined pricing," i.e., achieves premium yields in line with medical cost trends or increases in premiums at the same percentage as medical costs are increasing.  Plaintiff cites numerous examples of defendants' statements in which they describe this "disciplined pricing" practice throughout the class period which are described in detail below.

By December 30, 2005, plaintiff alleges that Aetna's share price had climbed to a split-adjusted closing price of $47.07 per share and stood at a closing price of $48.61 per share as the month of February 2006 opened.[3]  On February 9, 2006, plaintiff alleges that Aetna announced

_____

[2]  The MCR is the ratio of the dollars a health care company spends on medical costs, physician reimbursement and other claims-related services (medical costs) expressed as a percentage of premiums charged to the insured for such services (Medical Costs/Premiums= MCR).  If the ratio is high because medical costs are high relative to insurance premiums collected, then the insurance is less profitable to the insurance provider.  MCR is impacted by the manner in which the health care company prices its products in and around the time that MCR and medical cost trend projects are being made.  Specifically, if a health care company is charging too low a premium relative to the projected medical costs of providing the insurance, membership/enrollment will increase because insureds will seek lower premiums.

[3]  Plaintiff asserts that Aetna's stock price has been adjusted, where appropriate, for the 2-for-1 stock splits that occurred on March 14, 2005 and February 21, 2006.

3

its results for Q4 2005.  At that time, Aetna stated that operating earnings, excluding prior-period

favorable reserve development, were $1.26 per share, an increase of 38% compared to the prior-

year quarter, and that "[t]he increase in operating earnings reflect[ed] a 14 percent increase in

revenue from strong membership growth, as well as strong underwriting results and continued

general and administrative expense efficiencies."  Plaintiff asserts that, in its earnings release,

Aetna reported a Commercial Risk MCR of 76.8% in Q4 2005, compared to 77.6% in Q4 2004.

During Aetna's February 9, 2006 conference call, plaintiff alleges that defendants

Williams and Rowe both emphasized that Aetna continued to adhere to its pricing discipline.

Plaintiff alleges that the market reacted favorably to this information; Aetna's shares, which had

closed on February 8, 2006 at $47.98 per share, reached $52.48 per share by February 23, 2006.

Plaintiff asserts that, starting no later than September 2005, about one month prior to the

October 27, 2005 Q3 earnings release, defendants concealed from investors that Aetna had begun

charging too little for its health insurance products for the purpose of boosting Aetna's

membership rosters.  As reflected in a Reuters article dated April 27, 2006, FTN Midwest

Securities conducted a survey that analyzed pricing by Aetna and plaintiff alleges that it

demonstrated that Aetna aggressively under-priced the market to bring in new business.  The

Reuters article states:

> AGGRESSIVE PRICING?
> HMOs have posted high profits even amid rapid medical cost inflation by jacking up their
> premiums.  Now, pricing competition among the top players remains a worry, particularly
> at Aetna.  FTN Midwest Securities published a survey last year which showed that
> despite steady increases in its premiums, Aetna most aggressively underpriced its peers to
> bring in new corporate business.  "We believed Aetna is the most aggressive pricer in the
> marketplace, and it appears from this quarter, they are," FTN Midwest analyst Peter
> Costa, who has a "neutral" rating on the stock, said.  Costa also noted financial results
> from Wellpoint and UnitedHealth Group Inc. [both Aetna competitors], bear that out, as

they both had weaker-than-expected commercial membership.  Membership in Aetna's health plans rose to 15.4 million, up 663,000 members.

Plaintiff asserts that FTN's survey documents that Aetna's under-pricing began in September.[4]

Plaintiff asserts that, according to an article appearing in Barron's Online dated August 21, 2006, Aetna began under-pricing its plans in September 2005.  The article states:

> [Peter] Costa . . . [, an analyst who covers Aetna for FTN Midwest Securities,] says that, based on interviews last September with benefit consultants and insurance brokers, "we concluded that Aetna was being the most aggressive in pricing" the national accounts, each of which covers at least 3,000 people.  After Aetna's stock blew up [in April 2006], "we found they were being less aggressive," he notes.

Plaintiff alleges that the FTN survey's conclusions about Aetna's under-pricing as reported by Reuters and Barron's is corroborated by accounts of former Aetna employees who believed under-pricing either did or may have occurred at Aetna in 2005 and/or 2006.

Plaintiff alleges that Confidential Witness 1 (CWl), an Aetna employee from January 1995 to July 2006, was a process leader for national accounts responsible for putting together new business proposals for national accounts consisting of 3,000 or more employees.  CW1 was "as busy as ever" with proposals for national accounts 12 to 18 months prior to CWl's departure.  CW1 believed that during the second half of 2005 and the first half of 2006, there was "a big push to get national account business, even if [Aetna] did not make any money."  CWl suggests that Aetna was willing to lose money on an account in hopes of meeting membership goals.  Plaintiff claims that CWl attended meetings and received emails from six or seven regional heads

---

[4]  Plaintiff alleges that, because FTN survey was never disseminated to the market at large, its results were unknown to the majority of investors prior to publication of the Reuters article and its original public date does not affect its loss causation theory.  Defendants have provided the original survey as Exhibit 24 in their appendix to the motion to dismiss and, as it was referenced in plaintiff's complaint, I will consider the full text and whether it could affect loss causation.

telling CWl to put together the proposals even if it meant that Aetna would lose money.

Plaintiff alleges that CWl stated that Aetna's goal was to get the customer, even if it meant that Aetna would lose money on one, three, or five-year contracts.  CW1 stated that Aetna hoped to make up the losses after the customer renewed the contract and that entering into money-losing contracts was a "common practice" for Aetna because competition was tough. CW1 provided Applera Corporation, located in Norwalk, Connecticut, as an example of a dental-only customer with which Aetna had entered into a money-losing contract for three years. Actuaries informed CW1 what the expenses were for each account, so CW1 could tell when Aetna lost money on an account.  CW1 stated that CW1 believed that Aetna lost money on 30% to 40% of its renewal and new customer contracts.

Similarly, plaintiff alleges that Confidential Witness 2 (CW2), an underwriting analyst, said that as early as CW2's first day of work at Aetna, CW2 noticed that colleagues were complaining about the company's "pricing" practices.  CW2's underwriting practice was focused on small groups and CW2 said there was a boost in small group customers from the time CW2 started until at least 2006, but stressed that even though there were new accounts coming in the business was not nearly as lucrative as it might have been in years past.  Plaintiff asserts that this was due, in part, to the fact that CW2 was increasingly pressed by supervisors to accept "high risk groups."  Using rates provided by CW2's bosses that were calculated by actuaries, CW2 would integrate the data that CW2 had collected about the small company in question and determine a "quote" to present to the broker.  If the broker balked at the price, CW2 was authorized to work with the broker to lower the quote.

Plaintiff alleges that CW2 stated that this process typically meant taking "drastic

6

measures" and "overlooking a pre-existing condition" that Aetna typically did not accept without

high rates.  To get the sale, CW2 said that Aetna was "not going to scrutinize."  For example,

CW2 recalled that Aetna began accepting high blood pressure as a condition that would not merit

a hike in the customer's premium whereas previously such a condition would require a higher

rate.  CW2 would run the calculations by CW2's supervisor and was almost always permitted to

allow the pre-existing condition at a lower premium.  The willingness of supervisors to go so low

in a quote was frustrating to CW2 and CW2's colleagues who told supervisors to "stop being so

lenient."  Even though this may have helped CW2 make CW2's numbers in the short run by

bringing in new small groups, CW2 felt the process was "misleading to employees and

shareholders."  CW2 stated that as long as CW2 was booking new business, CW2 knew that

Aetna's numbers would look good.  However, CW2 also stated that by allowing certain pre-

existing conditions in at low premiums, Aetna's pricing policy decreased its profit margins.

According to CW2, it made sense that the projected MCR went up in the beginning of 2006

because that was the time that claims were increasing as a result of Aetna's "leniency."  During

CW2's time at Aetna, CW2 asserts that no small group application was ever turned away.  CW2

stated that "[Aetna] used no discretion to get the sale."

　　　Plaintiff asserts that Confidential Witness 3 (CW3) further confirmed Aetna's under-

pricing activity as an Aetna underwriter and salesperson.  It was CW3's impression that Aetna

was "very aggressive" and that when entering a marketplace, Aetna would "initially offer an

attractive rate in order to hit membership targets."  CW3 provided the group information to the

underwriters, and they would provide CW3 with the group's rates.  CW3 said that the "rates set

were not sustainable" and that they were "particularly aggressive."  According to plaintiff, CW3

also recalled hearing that small group business in other areas were priced "aggressively" and at unsustainable rates at various times.  CW3 provided the following examples of places and time periods during which the pricing was particularly low:  Georgia (2005-2006) and Ohio, particularly around Cleveland (2005 through early 2007).

Plaintiff alleges that defendants' fraudulent scheme was exposed when Aetna announced on April 27, 2006 that its MCR of 79.4% for the first quarter 2006 was much higher than anticipated.  Aetna's April 27, 2006 announcement revealed that first quarter 2006 MCR was 1.5% (150 basis points) higher than the year-earlier first quarter and 1.3% (130 basis points) higher than in the fourth quarter of 2005.

Following the April 27, 2006 announcement regarding the increase in MCR, plaintiff asserts that Aetna's stock fell substantially.  From April 26, 2006 to April 27, 2006, Aetna's stock fell from $46.43 per share to $37.00 per share, a decline of $9.43 per share, or over 20 percent, representing a loss in market capitalization of $5.4 billion.

After being told on February 9, 2006 that Aetna's Q1 2006 MCR would be the lowest for the year, plaintiff alleges that the dramatic increase in MCR caused analysts with SG Cowen & Co. and the Wall Street Journal to become concerned that Aetna was in fact under-pricing compared with competitors WellPoint and UnitedHealth and suggesting that it was a departure from its previous pricing discipline.

Plaintiff alleges that defendants continued to mislead the public by failing to advise analysts and investors of Aetna's practice of under-pricing and its resultant effect on the first quarter MCR in a follow-up conference call on May l, 2006.  Plaintiff asserts that defendants knowingly mis-attributed the cause of the high MCR to other factors, while steadfastly

maintaining that Aetna's higher-than-expected membership growth was "solid and balanced growth that is representative of our dedication to disciplined pricing."  Moreover, plaintiff alleges that defendants continued to make false and misleading statements while claiming that the MCR would be up "slightly" during the second quarter when it alleges that defendants knew there would be a substantial increase in the second quarter as well due to Aetna's under-pricing. Finally, during the same call, Aetna advised that it was lowering its projected full-year MCR guidance from 80% to 79% which plaintiff claims "comforted" analysts, but that defendants knew that Aetna would not be able to meet such an MCR given the effects the under-pricing was having, and would continue to have, on the quarterly MCRs.

Plaintiff asserts that defendants "shocked the market" on July 27, 2006 by announcing that Aetna's second quarter MCR came in at 81.4% (compared with 78.9% for the second quarter of 2005 - an increase of 2.5 percentage points).  In addition, defendants announced that Aetna was changing its full-year MCR guidance again - this time raising it back up to 80%.  Defendants note that Aetna's full-year MCR for 2006 was 79.4%.

Plaintiff alleges that these disclosures had an immediate, adverse impact on the market; from July 26, 2006 to July 27, 2006, Aetna's stock dropped from $39.96 per share to $33.25 per share, a decline of $6.71 per share, or almost 17%.  The trading volume increased from 5,066,300 on July 26 to 35,884,900 on July 27.

Plaintiff claims that several analysts concluded that under-pricing was in fact responsible for Aetna's higher MCR, including Cowen & Co. which downgraded Aetna stock to Neutral, noting "significant deter. suggests poor medical cost mgmt &/or inadequate pricing."  Cowen & Co., "Downgrading Stock on Lack of MLR Visibility," at 1 (July 27, 2006). The Dow Jones

9

newswire reported that Aetna "recorded higher medical costs as a percentage of premium revenue for the second quarter in a row Thursday, prompting concerns that the health insurer has been pricing premiums aggressively in the face of growing competitive pressures in the managed-care industry."  According to Merrill Lynch:

> certain factors are consistent with Aetna having aggressively priced business in 2004-2005.  These include more rapid organic enrollment growth than its peers and a subsequent higher-than-expected medical cost ratio in the first half of this year, 'and now a reduction of enrollment coinciding with an expectation that [the MCR] will improve.'

Dinah Wisenberg Brin, "Aetna's High Medical Cost Ratio Pressures Shares," Dow Jones News Service, July 27, 2006.   An August 21, 2006 article in Barron's noted that FTN Midwest Securities, an institutional equity research firm, had concluded, based upon interviews it conducted with benefit consultants and insurance brokers during September 2005, "that Aetna was being the most aggressive in pricing" national accounts, each of which covered at least 3,000 people.  Lawrence C. Strauss, "Healing Aetna," Barron's, August 21, 2006.

Plaintiff also asserts that in February 2006 individual defendants Rowe, Bennett and Callen, but not Williams, sold substantial amounts of Aetna stock at allegedly artificially-inflated prices near Aetna's class period-high stock price.  See infra Section III. A.

II.    Alleged Materially False and Misleading Statements

Plaintiff alleges that, throughout the class period, defendants issued numerous false and misleading statements regarding its practice of under-pricing and/or aggressively pricing its accounts at the expense of profitability, resulting in substantially higher than projected MCRs for the first and second quarters of 2006.  Plaintiff asserts that the following statements were materially false and misleading and were lacking in reasonable basis at the time they were made.

10

A.      October 27, 2005 Q3 2005 10-Q, Press Release and Earning Conference Call

Plaintiff asserts that Aetna filed its Form 10-Q for the third quarter ending September 30, 2005 (the "Q3 2005 10-Q") with the SEC on October 27, 2005.  In conjunction with the filing of its Q3 2005 10-Q, Aetna issued the October 27, 2005 Press Release touting its rising operating earnings that were fueled by, inter alia, "strong membership growth."  With regard to its Health Care segment, Aetna specifically noted that Q3 2005 operating earnings were $351.3 million, compared with $268.1 million in Q3 2004.  Excluding favorable developments of $15 million (after tax) in Q3 2005 and $14 million (after tax) in Q3 2004, operating earnings increased 32.3% to $336.3 million in Q3 2005, from $254.1 million in Q3 2004.  According to Aetna, this "increase primarily reflect[ed] growth in revenues from higher membership levels, as well as strong underwriting results and continued general and administrative expense efficiencies."

Plaintiff asserts that defendants also claimed an improving MCR because, excluding favorable reserve developments, its MCR was 79.0 percent in Q3 2005, compared to 79.2 percent in Q3 2004.  Commenting on these results, Rowe stated that Aetna's "continued diligence around medical cost management has allowed us to have among the lowest [MCRs] in the industry."  Plaintiff alleges that Aetna's shares jumped from an adjusted closing price of $40.76 per share on October 26, 2005 to an adjusted closing price of $44.18 per share by the end of October 31, 2005.

Plaintiff asserts that in an October 27, 2005 Q3 2005 Earnings Conference Call held in conjunction with the filing of Aetna's Q3 2005 10-Q, investors were again falsely assured of Aetna's disciplined pricing practices when Williams stated:

> Perhaps the best example of our operational performance is our dedication to disciplined pricing and medical management. Our pricing policy remains consistent and is based on achieving premium yields in line with our forward view of medical cost trend. We

11

continue to exercise pricing discipline across all products and customer market segments
for both this year and as we write new business for 2006.

And when asked by Lehman Brothers Analyst Josh Raskin whether there was a change in

"pricing dynamics," plaintiff asserts that Williams responded:

> No, I think as I said before, . . . the marketplace is a competitive marketplace.  It has been
> and it continues to be competitive.  We have, we believe, very strong pricing discipline
> and our focus on how we design products that add value to customers, and not compete
> on the basis of price alone.

Later, in response to another analyst on that conference call, plaintiff asserts that Williams stated:

> I am not sure I can answer your question directly. But let me say what I think I understand
> you to ask, which is, one, we are pricing very clearly in line with our medical cost trend.
> Two, that we have a very strong amount of pricing discipline.  And because we're in a lot
> of different segments and geographies, there will be different prices, different product
> mixes that are appropriate to the needs of each of those.

> What we are doing is making certain that we are pricing appropriately as best we can, to
> be certain that we're meeting our shareholder expectations. We feel very good about what
> has happened this year, and therefore have given the guidance we have given for '06.

Plaintiff asserts that the statements set forth in the October 27, 2005 Press Release and

Conference Call were materially false and misleading at the time they were made for at least the

following reasons:  (1) defendants were not practicing disciplined pricing; (2) defendants were

not pricing premiums in line with medical costs; (3) defendants had been under-pricing or

aggressively pricing its accounts in order to obtain new membership at the expense of

profitability and (4) defendants' under-pricing of new accounts resulted in higher costs and, in

turn, a higher MCR.  Further, plaintiff asserts that defendants concocted other excuses for the

higher MCR while it reduced enrollment or raised premiums to address the problem.  As a result,

plaintiff alleges that Aetna's statements about its disciplined pricing practices were lacking in

reasonable basis when made.

B.      February 9, 2006 Q4 Earnings Conference Call and Press Release

Plaintiff asserts that defendants continued to mislead analysts and investors regarding Aetna's practice of under-pricing and its effects on Aetna's MCR into 2006.  In Aetna's Q4 2005 Earnings Conference Call on February 9, 2006, Williams stated:  "Our pricing discipline is unchanged, with commercial risk premium yield percentage increases projected to be in line with our medical cost trend percentage."

Plaintiff asserts that, in the Q4 2005 Earnings Conference Call, defendants Williams and Rowe also both emphasized that Aetna continued to adhere to its pricing discipline.  Rowe stressed Aetna's "disciplined approach to pricing" while Williams emphasized Aetna's commitment to "profitably grow market share and earnings" through "disciplined pricing" and noted that "[o]ur pricing discipline is unchanged.. . ."

In the February 9, 2006 Press Release, plaintiff asserts that Aetna announced its results for Q4 2005, stating that operating earnings, excluding prior-period favorable reserve development, were $1.26 per share, an increase of 38 percent compared to the prior-year quarter, and that "[t]he increase in operating earnings reflect[ed] a 14 percent increase in revenue from strong membership growth, as well as strong underwriting results and continued general and administrative expense efficiencies."  Plaintiff also asserts that Rowe boasted that Aetna's "medical membership had grown by 1.1 million" during 2005, and claimed that Aetna continued to "maintain[] among the lowest medical cost trends in the industry."

Plaintiff asserts that the statements made in the Q4 2005 Earnings Conference Call and the February 9, 2006 Press Release were materially false and misleading at the time they were made for at least the following reasons:  (1) defendants were not practicing disciplined pricing;

13

(2) defendants were not pricing premiums in line with medical costs; (3) defendants had been

under-pricing or aggressively pricing its accounts in order to obtain new membership at the

expense of profitability and (4) defendants' under-pricing of new accounts resulted in higher

costs and, in turn, a higher MCR.  Plaintiff asserts that as a result the defendants' statements

about Aetna's disciplined strategy were lacking in reasonable basis when made.

      C.    <u>March 1, 2006 2005 Annual Report</u>

      Plaintiff alleges that defendants also misled the market concerning Aetna's under-pricing

practices when Aetna filed its 2005 Annual Report with the SEC along with its Form 10-K for

the year ended December 31, 2005 on March 1, 2006.  The 2005 Annual Report stated:

> During 2005, we continued to improve our operating earnings, cash flows from
> operations and financial position.  The period of 2002 to 2004 was one of financial
> turnaround for us as a company.
>
> After recording operating losses in 2001, we returned to profitability in 2002 due
> primarily to significant premium rate increases, targeted reductions of unprofitable
> membership and an increased focus on managing rising health care costs.  During 2003,
> our financial performance improved, although our medical membership and revenue
> declined.  During the last two years, significant accomplishments that have helped
> improve our operating earnings, cash flows from operations as well as overall financial
> position include:
>
>> Growth in medical membership and our specialty products combined with
>> premium and fee rate increases contributed to increases in total revenues.
>
>> Disciplined pricing and our continued focus on managing medical costs led to
>> improved heath care underwriting results.
>
>> Consistent focus on operating expenses led to greater efficiencies.
>
>> Effective deployment of substantial capital for share repurchases, strategic
>> acquisitions and pension plan funding.
>
> During 2004 and 2005, we experienced membership increases in both our fully insured
> and our administrative service contract ("ASC") books of business.  Our medical

membership increased by 1.1 million members in 2005 and 654,000 members in 2004.  In addition, during this period we had growth in our specialty products of dental, pharmacy and group insurance.  As of December 31, 2005, we served approximately 14.8 million medical members, 13.1 million dental members, 9.4 million pharmacy members and 13.6 million group insurance members.  Premium and fee rate increases, coupled with the growth in membership, helped expand our total revenues, which increased approximately $2.6 billion in 2005 and $1.9 billion in 2004.

The underwriting results in our health care business reflect our focus on medical cost management and our pricing policy of achieving premium yields that are in-line with medical cost trends.  These factors contributed to comparatively stable medical cost ratios during the years 2003 through 2005.

(Emphasis removed).

Plaintiff asserts that the statements made in the 2005 Annual Report were materially false and/or misleading at the time they were made for at least the following reasons:  (1) defendants were not practicing disciplined pricing since at least September 2005; (2) defendants were not pricing premiums in line with medical costs; (3) defendants had been under-pricing or aggressively pricing its accounts in order to obtain new membership at the expense of profitability; and (4) defendants' under-pricing of new accounts resulted in higher costs and, in turn, a higher MCR.  Plaintiff asserts that as a result of the foregoing, the defendants' statements about Aetna's disciplined pricing strategy were lacking in reasonable basis when made.

> D.    April 27, 2006 Q1 2006 10-Q, Press Release and Earnings Conference Call

Plaintiff asserts that defendants also misled the market concerning Aetna's under-pricing practices when Aetna filed with the SEC on April 27, 2006 its Form 10-Q for the quarter ending March 1, 2006 (the "Q1 2006 10-Q").  The Q1 2006 10-Q stated:

Excluding the favorable development of prior period health care cost estimates (including the release of reserves in 2005 related to participation in the New York Market Stabilization Pool), our adjusted Commercial Risk medical cost ratio was 79.4% for the three months ended March 31, 2006 and 77.9% for the comparable period in 2005 (refer

to the reconciliation of Commercial Risk health care costs to adjusted Commercial Risk health care costs for the first quarter of 2005 below).  This increase in the medical cost ratio for the first quarter of 2006 reflects a percentage increase in per member medical costs that outpaced the percentage increase in per member premiums, due to higher medical cost trends for inpatient and outpatient facility and physician services offset by a moderation in medical cost trend for ancillary and pharmacy services.

Plaintiff asserts that the statements made in the Q1 2006 10-Q were materially false and/or misleading at the time they were made for at least the following reasons:  (1) defendants were not practicing disciplined pricing since at least September 2005; (2) defendants were not pricing premiums in line with medical costs; (3) defendants had been under-pricing or aggressively pricing its accounts in order to obtain new membership at the expense of profitability; and (4) the stated reasons for the increase in the first quarter 2006 MCR were, therefore, false and/or misleadingly incomplete.

In Aetna's April 27, 2006 Press Release announcing its Q1 2006 results, plaintiff asserts that Williams stated that "Aetna continues to deliver superior financial results, with another quarter of strong growth in membership, revenue and earnings."

On the same day, Aetna held a conference call with securities analysts (the "Q1 2006 Earnings Conference Call").  Plaintiff asserts that during the call, Williams explained Aetna's higher-than-expected MCR result by claiming that "we continue to adhere to our pricing discipline, which is based on achieving premium yields that are in line with our medical cost trend."  He further stated that "[w]e are updating our full-year MCR guidance to be approximately 79% . . . ."

Plaintiff asserts that, in addition, Bennett, Aetna's CFO, claimed that:

Also in our Healthcare segment, our commercial risk MCR, excluding reserve development for all periods, was 79.4% in the first quarter, an increase of 130 basis

16

points from the fourth-quarter 2005 level and 150 basis points from the first quarter of 2005. To provide more details around our full year MCR guidance of around approximately 79%, we expect a quarterly pattern to reflect a slightly higher MCR in the second quarter compared to the first-quarter level . . . .

Plaintiff asserts that the statements set forth in the Q1 2006 Earnings Conference Call were materially false and misleading at the time they were made for at least the following reasons:  (1) defendants were not practicing disciplined pricing; (2) defendants were not pricing premiums in line with medical costs; (3) defendants knew that they would be unable to satisfy its updated full-year MCR guidance of 79%; (4) defendants failed to disclose that the higher than expected first quarter MCR was due to its practice of under-pricing; (5) defendants failed to disclose that Aetna's projected "slightly" higher second quarter MCR was due to Aetna's practice of under-pricing; (6) defendants knew that because of their under-pricing of policies, the second quarter MCR would in fact be substantially higher rather than "slightly" higher; (7) defendants had been under-pricing or aggressively pricing its accounts in order to obtain new membership at the expense of profitability; and (8) defendants' under-pricing of new accounts resulted in higher costs and, in turn, a higher MCR.  As a result of the foregoing, plaintiff alleges that the defendants' statements about the higher than expected Q1 2006 MCR, the "slightly" higher Q2 2006 MCR, the updated full year MCR guidance, and Aetna's "disciplined" pricing were lacking in reasonable basis when made.

E.    May 1, 2006 Conference Call

Later, on a follow-up conference call with analysts on May 1, 2006, plaintiff asserts that Williams further misled investors regarding Aetna's under-pricing and its effect on the higher first quarter MCR when discussing the seasonal pattern of the MCR:

17

Now, moving to the issue of our commercial medical cost ratio, or MCR, I would like to comment on our view of the seasonal pattern of the MCR, because I know this was a point of confusion.  I would like to discuss the components of this change.

The first factor that I would highlight would be the effect of our membership derived from smaller case sizes.  Smaller cases renew essentially ratably throughout the four quarters of the year.  This is in contrast to most of our provider contracts that renew or have cost increases effective on a calendar year basis.  Secondly, the first-quarter MCR is affected by the seasonally higher MCRs for dental and student health products . . . . Finally, other mix factors, including geography and product, contributed approximately 20 to 30 basis points of the change.  In addition, some have questioned our membership growth and said that we must be pricing aggressively . . . .

Of the 82,000 total fully insured additions, 15,000 are Medicaid Advantage, 4,000 were in student health, 14,000 in SRC and 23,000 in individual.  That leaves growth of 26,000 members from our main customer markets of national, middle and small group.  This is solid and balanced growth that is representative of our dedication to disciplined pricing, as well as the broad diversification of markets we are actively pursuing.

I will end my comments by reaffirming to you my personal commitment to continue to maintain discipline and rigor in everything we do at Aetna.

Plaintiff asserts that the statements made in the May 1, 2006 Conference Call were materially false and misleading at the time they were made for at least the following reasons:  (1) defendants were not practicing disciplined pricing; (2) defendants were not pricing premiums in line with medical costs; (3) defendants knew that they would be unable to satisfy their updated full-year MCR guidance of 79%; (4) defendants failed to disclose that the higher than expected first quarter MCR was due to their practice of under-pricing; (5) defendants failed to disclose that their projected "slightly" higher Q2 MCR was due to their practice of under-pricing; (6) defendants knew that because of their under-pricing of policies, the Q2 MCR, would in fact be substantially higher rather than "slightly" higher; (7) defendants had been under-pricing or aggressively pricing its accounts in order to obtain new membership at the expense of profitability; (8) defendants' under-pricing of new accounts resulted in higher costs and, in turn, a

18

higher MCR; and (9) to remedy the MCR shortfalls, defendants concocted alternative excuses for the higher than expected MCR.  As a result of the foregoing, the defendants' statements about the higher than expected Q1 MCR, the "slightly" higher Q2 MCR, the updated full year MCR guidance, and its disciplined pricing were lacking in reasonable basis when made.

      F.      <u>May 16, 2006 and June 2, 2006 Conference Calls to Investment Groups</u>

Plaintiff claims that Williams reiterated Aetna's commitment to disciplined pricing during a May 16, 2006 Bank of America Securities 2006 Health Care Conference call:

> We also continue as a priority to exhibit commitment to discipline pricing.  I think it is important to understand that the management incentives and discipline that we have are aligned to profit increases.  We operate a set of fully allocated profit and loss P&Ls throughout Aetna where general managers are incited to achieve both the profit margins that we have committed to, as well as to achieve a discipline level designed to help maximize those margins and not simply to support membership growth.  Given a decision, we will always take profitability over growth.

On June 2, 2006, at a Sanford C. Bernstein & Co. Strategic Decisions Conference call, plaintiff alleges that Williams again reassured investors that Aetna was not under-pricing, stating that Aetna remains "committed to pricing discipline, [as it has over] the past five years."  Aetna is "not interested in selling on price. . . ."

Plaintiff asserts that the statements made on May 16, 2006 and June 2, 2006 were materially false and misleading at the time they were made for the following reasons:  (1) defendants were not practicing disciplined pricing; (2) defendants were, in fact, sacrificing profitability for growth; (3) defendants had been under-pricing or aggressively pricing its accounts in order to obtain new membership at the expense of profitability; (4) defendants' under-pricing of new accounts resulted in higher costs and, in turn, a higher MCR; and (5) to remedy the MCR shortfalls, defendants concocted other excuses for the higher than expected

MCR.  As a result of the foregoing, plaintiff alleges that defendants' statements about its disciplined pricing were lacking in reasonable basis when made.

>    G.    GAAP Filings

Plaintiff also asserts that defendants violated GAAP regulations in filing documents with the SEC.  Plaintiff asserts that defendants had knowledge of material adverse information concerning Aetna's practice of under-pricing, its MCR and its financial statements during the Class Period, and had an obligation to disclose such adverse information pursuant to Regulation S-K, Item 303.  Plaintiff further alleges that defendants' failure to do so renders their class period SEC filings, including the Q3 2005 Form 10-Q (filed October 27, 2005); the Fiscal Year 2006 Form 10-K (filed March 1, 2006); Aetna's Proxy Statement on DEF 14A (filed March 21, 2006); the Q1 2006 Form 10-Q (filed April 27, 2006) and the Q2 2006 Form 10-Q (filed July 27, 2006), materially incomplete, false and misleading.

III.    Scienter Allegations

Plaintiff asserts that defendants each, and/or together in concert, knowingly or with extreme departure from standards of ordinary care so as to amount to recklessness:  (a) engaged in acts, practices and a scheme and course of business that artificially inflated Aetna's stock price during the class period; and/or (b) issued, or caused Aetna to issue, materially false and misleading statements (or acquiesced in the issuance of such statements) that artificially inflated Aetna's stock price during the class period.  Among other things, plaintiff alleges that this price inflation was orchestrated to allow Aetna insiders to cash-in on stock option awards while Aetna's stock was trading at or near its all time high.

Plaintiff asserts that individual defendants knew as early as September 2005 that Aetna

was aggressively under-pricing its plans.  They claim that an analyst's report and the statements of numerous Confidential Witnesses establish defendants' knowledge or reckless disregard of such under-pricing.  According to an analyst at FTN Midwest Securities, based on interviews that FTN conducted in September 2005 with benefit consultants and insurance brokers, FTN concluded that Aetna was the health care company acting the most aggressively in terms of pricing national accounts.  In fact, plaintiff argues that the survey FTN conducted showed that Aetna aggressively underpriced its peers to bring in new corporate business.

In addition, plaintiff asserts that several confidential witness employees corroborate FTN's conclusion that Aetna was under-pricing in late 2005 and/or early 2006.  Therefore, even while Aetna was issuing the February 9, 2006 forecast of a seasonally low Q1 2006 MCR, plaintiff asserts that defendants were aware that, due to under-pricing, MCR had been on the rise since as early as September 2005, but they concealed this information in order to monetize senior management's personal stock gains in advance of the dramatic rise in MCR and corresponding collapse of Aetna's stock price.

Plaintiff asserts that defendants' motives in issuing the misstatements are evidenced by: (a) the unlawful insider trading that occurred between issuance of the February 9, 2006 positive MCR report and the April 27, 2006 acknowledgment, that MCR guidance had dramatically increased (which is evidence of under-pricing); and/or (b) the desire to increase the value of defendants' stock holdings generally, especially since their stock holdings far outweighed their cash and bonus compensation.

Plaintiff alleges that defendants Rowe, Bennett and Callen (the "insider trading defendants"), but not Williams, had a motive to commit fraud that included their ability to profit

from sales of Aetna stock at artificially inflated prices.  They collectively sold more than 1.2 million shares of their Aetna stock netting $61 million on the open market in February 2006.  At the time these sales were made, plaintiff alleges that insider trading defendants knew or recklessly disregarded that Aetna was under-pricing policies since at least September 2005 and that these sales were made prior to the initial, partial revelation on April 27, 2006, that Aetna was engaging in under-pricing which caused a spike in its MCR.

Plaintiff alleges that the trades of insider trading defendants between February 1, 2006 and February 27, 2006, occurred at prices between $48 - $52.40 per share for gross proceeds of over $61 million.  These trades all occurred within less than thirty days of Aetna's stock price reaching its peak closing price during the class period of $52.48 on February 23, 2006.  Plaintiff alleges that the insider trading defendants had knowledge of Aetna's under-pricing in or about September 2005 when Aetna's stock price (split-adjusted) was approximately $40.  The allegedly undisclosed under-pricing contributed to the alleged artificial inflation of Aetna's stock price, which rose to more than $52 in February 2006 and remained above $50 per share into March.

Plaintiff alleges that the insider trading defendants' near-simultaneous adoption of 10b5-1 trading plans and the timing of the sales creates further suspicion.  According to an article appearing on December 18, 2006 in <u>Business Week</u>, titled "Insiders With A Curious Edge:  How Corporate Executives Seem To Be Violating The Spirit, If Not The Letter, Of A Rule Meant To Prevent Insider Trading," Aetna's allegedly insider sales (detailed below) were one of a handful of corporate insider sales singled out as being highly suspicious despite the presence of 10b5-1 trading plans.  <u>Business Week</u> conducted a study of companies that had experienced a 20% stock slide in the past year, including Aetna, and the results showed that "sales were concentrated in

22

the months leading up to a stock's peak . . . then trailed off or ended as the stock dove."

Business Week noted that Rowe, Bennett and Callen all had set up 10b5-1 trading plans from early October to mid-November 2005, while at the same time "[s]ome analysts began raising questions about whether Aetna had priced its policies too aggressively."  According to Business Week:

> The Aetna example points to another issue:  groupthink. Companies stress that trading plans represent the personal financial decisions of executives to diversify holdings and have nothing to do with anyone's opinions on the stock's prospects.  Yet in many cases more than one executive seems to arrive at that personal decision at the same moment.

Defendants claim that the trading plans of all three insider trading defendants called for major sell-offs of their shares concentrated in the month of February 2006, when Aetna's stock peaked at $52.48 (on February 23rd), and traded between $48 and $52.40 for all of the insider sales at issue here.  This price peak was up from $10 per share just three years earlier.

### A.      Individual Defendants

Plaintiff alleges that individual defendants directed, knew about or recklessly disregarded the fraudulent practices implemented under their watch, including Aetna's under-pricing practices and their subsequent practice of fraudulently denying the same.  As directors and/or officers of Aetna, plaintiff claims that each individual defendant was involved in the decisions concerning disclosures or non-disclosures about Aetna's MCR, pricing and medical cost trend.

#### 1.      Defendant Rowe

Plaintiff alleges that Rowe was appointed Chairman of Aetna on April 1, 2001 and was appointed President and Chief Executive Officer of the Company on September 15, 2000.  He served as Aetna CEO until February 14, 2006 and as President until May 27, 2002.  Rowe retired

from Aetna in October 2006.

Plaintiff asserts that as Chairman and Director of Aetna Rowe signed Aetna's 2005 10-K dated March 1, 2006 and as Chairman and CEO signed Aetna's 10-Q for the Q3 2005 dated October 27, 2005.  In addition, as Chairman and CEO during the class period, Rowe signed a certification dated October 27, 2005 annexed to Aetna's Q3 2005 10-Q, stating, among other things, that based on his knowledge:  (a) the Q3 2005 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and (b) the financial statements and financial information contained in the 10-Q fairly present the financial condition, results of Aetna's operations and cash flows.  Plaintiff asserts that the certification further stated that Rowe was responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting for Aetna and, in effect, that Aetna's internal controls over financial reporting were effective.  Rowe also made the statements during analyst conference calls and/or press or earnings releases identified herein which plaintiff alleges contained materially false and misleading information and/or omitted materials facts.  Plaintiff contends that prior to his retirement in October 2006, Rowe had the opportunity to commit fraud.

Plaintiff alleges that during the month of February 2006, Rowe or trusts over which he maintained control sold a total of 887,000 shares of Aetna stock for approximately $42 million. Rowe received over $42 million in stock sale proceeds during February 2006, while his combined salary and bonus for 2005 was $3 million.

2.    <u>Defendant Williams</u>

24

Plaintiff alleges that Williams is Chairman, CEO and President of Aetna.  He was elected Chairman on October 1, 2006, CEO on February 14, 2006 and President on May 27, 2002.  From March 15, 2001 until his appointment as President, Williams was Aetna's Executive Vice President and Chief of Health Operations.  He has been an Aetna director since 2002.

As CEO and President of Aetna, plaintiff asserts that Williams signed Aetna's 2005 10-K dated March 1, 2006 and Q1 2006 10-Q dated April 27, 2006.  In addition, as President and CEO, Williams signed certifications dated March 1, 2006 and April 27, 2006, which were annexed to Aetna's 2005 10-K and Q1 2006 10-Q, respectively, stating, among other things, that based on his knowledge:  (a) the 2005 10-K and Q1 2006 10-Q do "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and (b) the financial statements and financial information contained in the 10-K and 10-Q fairly present the financial condition, results of operations and cash flows of Aetna.  The certification further stated that Williams was responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting for Aetna and, in effect, that Aetna's internal controls over financial reporting were effective.  Williams also made the statements during analyst conference calls and/or in press or earnings releases identified herein which  plaintiff alleges contained materially false and misleading information and/or omitted materials facts.  Plaintiff asserts that Williams had the opportunity to commit fraud.

Plaintiff alleges that Williams also had a motive to commit the fraud alleged herein because he had a large equity stake in Aetna's success and the wealth to be derived from the

stock portion of his executive compensation package far exceeded his cash compensation. Whereas, according to Aetna's 2006 proxy statement dated March 21, 2006, Williams earned $2.7 million in salary and bonus for 2005, he held options on almost 6 million Aetna shares valued at more than $190 million as of December 31, 2005.

        3.     <u>Defendant Bennett</u>

At all relevant times during the class period, plaintiff alleges that Bennett was Aetna's Senior Vice President and Chief Financial Officer.  In this position, plaintiff asserts that Bennett signed Aetna's 2005 10-K dated March 1, 2006, Q3 2005 10-Q dated October 27, 2005, and Q1 2006 10-Q dated April 27, 2006.  In addition, as CFO , Bennett signed certifications dated March 1, 2006, October 27, 2005 and April 27, 2006 which were annexed to Aetna's 2005 10-K, Q3 2005 10-Q and Q1 2006 10-Q, respectively, stating, among other things, that based on his knowledge:  (a) the respective 10-K and 10-Qs do "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" with respect to the period covered by such 10-K and 10-Qs; and (b) the financial statements and financial information contained in such 10-K and 10-Qs fairly present the financial condition, results of Aetna's operations and cash flows.  Plaintiff alleges that these certifications further stated that Bennett was responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting for Aetna and, in effect, that Aetna's internal controls over financial reporting were effective.  Bennett also made the statements during analyst conference calls and/or press or earnings releases identified herein or acquiesced in such statements which plaintiff alleges contained materially false and misleading information and/or

omitted material facts.  Plaintiff asserts that Bennett had the opportunity to commit fraud.

Plaintiff alleges that during the month of February 2006, Bennett sold a total of 280,000 shares of Aetna stock for more than $14 million.[5]  Bennett received approximately $14.2 million in stock sale proceeds during February 2006, while his combined salary and bonus for 2005 was $1.09 million.  Bennett sold only 232,554 shares during 2005 and never sold more than 78,000 shares in any one calendar month in 2005.

### 4.    Defendant Callen

Plaintiff alleges that during all relevant times during the class period, Callen was Senior Vice President of Strategic Planning and Business Development for Aetna.  In this position, Callen made strategic decisions affecting corporate finance, capital investment and operations of Aetna's core businesses.  Plaintiff alleges that Callen's position as Aetna's head of Business Development provided him with knowledge of its aggressive under-pricing and the ability to control its disclosures during the class period so that Callen had the opportunity to commit fraud.

Plaintiff alleges that during the month of February 2006, Callen sold a total of 60,000 shares of Aetna stock for more than $3 million.  Callen received more than $3 million in stock sale proceeds during February 2006, while his combined salary and bonus for 2005 was just slightly over $1 million.  Callen had never sold Aetna stock prior to February 2006.

### B.    Individual Defendants Awareness of the Importance of Accurate MCRs

Plaintiff alleges that individual defendants were aware that MCR and medical cost trend were the most important financial metrics followed by financial analysts and the market as they

---

[5]  The allegedly insider trading transactions depicted herein have been adjusted, where appropriate, for two, 2-for-1 stock splits that occurred on March 14, 2005 and February 21, 2006.

consistently stated, both prior to and throughout the class period, that Aetna was not under-pricing its plans and would not sacrifice profitability for growth in membership.

As noted in a April 25, 2008 article appearing on Courant.com, the <u>Hartford Courant</u> website, a Deutsche Bank analyst stated that MCR is "the single most important data point" for Aetna and other companies in the health care insurance industry.  Plaintiff asserts that analyst reports and the financial press confirm the importance of MCR and the emphasis analysts place upon it.  For example, a February 9, 2006 CIBC World Markets analyst report covering Aetna stated:  "Every 50 basis point change in Aetna's commercial medical loss ratio [i.e., another term for MCR] impacts the company's earnings by about $0.20 per share. . . ."  A July 28, 2006 Bloomberg article quoted a CIBC World Markets analyst as follows:  "People want to see companies beating numbers on medical costs because this is the metric that tells us how well they are pricing versus cost trends."

Plaintiff asserts that individual defendants, each of whom (with the exception of Callen) signed Aetna's 2005 10-K, were responsible for the statement in the 10-K noting that a small miss in Aetna's projected MCR could cause a significant hit to the earnings expectations their projections created on Wall Street and, thus, a severe drop in Aetna's stock price.  Plaintiff alleges that under Critical Accounting Estimates, focusing on Health Care Costs Payable, the 2005 10-K states that even a 100-basis point change in medical cost trend would have resulted in a hit of nearly 5% to Aetna's 2005 net income of $1.6 billion.  Plaintiff contends that defendants understood this and the potentially devastating effect on Aetna's stock price.

Plaintiff alleges that confidential witnesses confirmed that Williams was a hands on manager who held numerous meetings so that management was kept abreast of important issues,

28

and individual defendants had ample tools at their disposal to detect under-pricing and to make

accurate projections.  Plaintiff asserts that Williams explained in the April 27, 2006 conference

call with analysts that, contrary to Aetna's February 9, 2006 projection that Q1 2006 MCR would

be the lowest, the Q1 2006 MCR increased 130 basis points on the Q4 2005 and 150 basis points

from the year-earlier Q1 2005.  Plaintiff asserts that defendants either knew that the statements

they made during the class period that Aetna was not under-pricing were untrue or, given their

management styles and the systems and controls in place at Aetna to detect under-pricing,

recklessly disregarded the existence of it.

Plaintiff alleges that according to Confidential Witness 6 (CW6), a project manager at

Aetna until December 2006 who worked on strategic planning in national accounts, Aetna senior

management was very involved in Aetna's day-to-day management.  Plaintiff claims that CW6

often saw Williams having coffee with Aetna employees and believed Aetna did a good job of

keeping its employees informed through internal communications and, among other things,

through quarterly company-wide meetings in which management reviewed status issues.

Plaintiff asserts that confidential witnesses also reveal that Aetna had the tools in place to

track medical and other costs and make projections.  For example, according to Confidential

Witness 5 (CW5), a Senior Underwriting Analyst at Aetna for more than 20 years, Aetna's senior

management used the "FISC" system to track costs.  This system, according to CW5, was used

nationwide at Aetna by underwriters and underwriting analysts to track premiums, claims and

lives, and it gave a fairly accurate "snapshot" of the status of a claim.  Similarly, plaintiff claims

that Aetna had the ability to accurately predict its membership rolls.  For example, according to

Confidential Witness 4 (CW4), a financial consultant responsible for calculating membership

projections for an Aetna region, on the first day of each month, CW4 projected membership two months in advance.  Fifteen days later, after receiving updated data from Aetna's sales personnel regarding lost sales, new sales and current members, CW4 updated the original projections.

Plaintiff alleges that Williams acknowledged that Aetna had strong internal controls capable of evaluating cost trends thereby enabling Aetna to make accurate projections.  As reported in a July 28, 2006 article in The Hartford Courant, the following exchange occurred between Williams and Costa, the FTN analyst, on the July 27, 2006 earnings conference call:

> On a conference call, some analysts were skeptical of Aetna's ability to get an early handle on rising medical costs, given the change from the April forecast.  "What gives us the confidence that your ability to forecast today is better than it was in the first half of the year?" asked Peter H. Costa, an analyst at FTN Midwest Securities Corp.

In response, plaintiff alleges that Williams called the question "fair" but said that Aetna has "strong control" and "good analytic capability in terms of understanding these issues. . . ." Williams also stated that Aetna has "a very rigorous forecasting process we go through." Plaintiff alleges that Williams' belief, as stated above, is consistent with the signed certifications of Rowe, Williams and Bennett attesting to the adequacy of Aetna's internal controls.  Plaintiff alleges that with tools and controls such as these in place, individual defendants were well positioned to know or did know that under-pricing was taking place.

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In ruling on a 12(b)(6) motion, I must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in plaintiff's complaint and must determine

whether "under any reasonable reading of the pleadings, the plaintiff[] may be entitled to relief." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (citations omitted).  Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  A well-pleaded complaint may proceed even if it appears "that recovery is very remote and unlikely."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a Rule 12(b)(6) motion, I do not "inquire whether the plaintiff[] will ultimately prevail, only whether [he is] entitled to offer evidence to support [his] claims."  Nami, 82 F.3d at 65, citing Scheuer, 416 U.S. at 236.

Because plaintiff makes claims of securities fraud, Federal Rule of Civil Procedure 9(b) and the PSLRA "impose independent threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6)."  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 224 (3d Cir. 2002).  Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity."  Although courts must be sensitive to a situation in which the factual information is in the defendant's control, in securities fraud cases Rule 9(b) is to be "rigorously applied."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417-18 (3d Cir. 1997).  The PSLRA adds an additional requirement, providing that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that defendant acted with the required state of

31

mind."  15 U.S.C. § 78u-4(b)(2).

A securities fraud claim may be dismissed under Rule 9(b) and the PSLRA even if it would survive scrutiny under Rule 12(b)(6).  "Unless [p]laintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by Rule 9(b) and the [PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis."  In re Rockefeller Ctr., 311 F.3d at 224.

DISCUSSION

Plaintiff alleges that all defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (Count I), that individual defendants violated Section 20(a) of the Exchange Act (Count II) and that all defendants violated Section 18 of the Exchange Act (Count III).

Under the PSLRA's heightened pleading instructions, a private securities complaint alleging that the defendants made a false or misleading statement must:  (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind," § 78u-4(b)(2). Tellabs, Inc. v. Makor Issues & Rights, Ltd., (Tellabs I), 127 S. Ct. 2499, 2508 (2007).  In determining whether to grant defendants' motion to dismiss, I must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, as well as other sources that courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take

32

judicial notice.  "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Id. at 2509, internal citations omitted.  I will thus consider the exhibits attached to defendants' motion to dismiss incorporated into the complaint by reference.  In order to determine whether the pleaded facts meet the PSLRA's "strong inference" standard, courts "must take into account plausible opposing inferences."  Id.

I.      Section 10(b) and Rule 10b-5 Claim

Plaintiff alleges that defendants violated Section 10(b) during the class period by making untrue statements of material fact and/or omitting to state material facts necessary to make the statements not misleading and/or substantially participating in the creation of misrepresentations about Aetna's pricing practices and MCR.  This allegedly operated as a fraud upon plaintiff and the class to maintain artificially high market prices of Aetna's common stock.

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5 further provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim for securities fraud under Section 10(b), plaintiff must

establish that defendants "(1) made a misstatement or an omission of a material fact (2) with

scienter (3) in connection with the purchase or sale of a security (4) upon which the plaintiff

reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her

injury."  In re IKON Office Solutions, Inc. Sec. Litig., 277 F.3d 658, 666 (3d Cir. 2002).  "To

establish securities fraud, plaintiff[] must establish a more exacting threshold of scienter."  Id.

That is, when allegations are made on information and belief, the complaint must not only state

the allegations with factual particularity, but must also describe the sources of information with

particularity, providing the who, what, when, where and how of the sources, as well as the who,

what, when, where and how of the information those sources convey.  Institutional Investors

Group v. Avaya, Inc., 2009 WL 1151943, at *7 (3d Cir. Apr. 30, 2009)

　　　　In its present motion, defendants argue that plaintiff's claim that defendants violated

Section 10b-5 must be dismissed for four alternative reasons:  (1) defendants' "disciplined

pricing" statements are not actionable because they are forward-looking statements protected by

the PSLRA safe harbor provisions; (2) plaintiff's complaint fails to plead the requisite strong

inference of scienter; (3) plaintiff's complaint fails to plead fraud with the requisite particularity

and (4) plaintiff's theory of loss causation is both unfounded and directly contradicted by their

"fraud-on-the-market" allegations.

　　　　The PSLRA established a safe harbor for "forward-looking statements" which are

immunized from liability if and to the extent that:

　　　　(A) the forward-looking statement is–

34

> (i) identified as a forward-looking statement, and is accompanied by *meaningful cautionary statements* identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) *immaterial*; or

(B) the plaintiff fails to prove that the forward-looking statement–

> (i) if made by a natural person, was made *with actual knowledge* by that person that the statement was false or misleading; or
>
> (ii) if made by a business entity, was–
>
> > (I) made by or with the approval of an executive officer of that entity; and
> >
> > (II) made or approved by such officer *with actual knowledge* by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1), emphasis added.  Defendants are immune from liability for forward-looking statements if this standard is met.  In re ATI Tech., Inc. Sec. Litig., 216 F. Supp.2d 418, 429 (E.D. Pa. 2002).

Plaintiff alleges that various press releases, earnings conference calls and 10-K and 10-Q forms issued by Aetna included misleading statements.  Plaintiff summarizes the allegedly misleading statements made by defendants or other parties during the class period as follows:

(a) Rowe's statement in the October 27, 2005 analyst conference call that: "we continue to adhere to a disciplined pricing policy of achieving premium yields that are in line with medical cost trends" and Williams' statements in the same call that (i) "[t]his pricing discipline has contributed to the stability we have realized in our . . . MCR," (ii) "[W]e are pricing very clearly in line with our medical cost trend . . . [W]e have a very strong amount of pricing discipline," (iii) "we are pricing appropriately as best we can, to be certain that we're meeting our shareholder expectations," (iv) "[o]ur pricing policy remains consistent," (v) "[w]e continue to exercise pricing discipline across all products and customer market segments for both this year and as we write business for 2006" and (vi) "[w]e have, we believe, very strong pricing discipline . . . .";

(b) Williams' statements in a February 9, 2006 earnings conference call that Aetna will not "sacrifice profitability for membership growth" and "our pricing discipline remains unchanged . . . . ";

(c) the statement in the 2005 10-K that "disciplined pricing and continued focus on managing medical costs led to improved health care underwriting results" and "the

underwriting results in our health care business reflect our focus on medical cost management and our pricing policy of achieving premium yields that are in-line with medical cost trends";[6]

(d) Williams' statement in the April 27, 2006 conference call with analysts that "we continue to adhere to our pricing discipline, which is based on achieving premium yields that are in line with our medical cost trend";

(e) Williams' statement in the May 1, 2006 follow-up call with analysts that "[membership growth] is solid and balanced growth that is representative of our dedication to disciplined pricing . . . ."; and

(f) Williams' statement at a May 16, 2006 analyst conference that "[w]e also continue as a priority to exhibit commitment to discipline[d] pricing . . . .  Given a decision, we will always take profitability over growth."

Defendants contend that these statements are protected under the PSLRA's safe harbor provision because they are forward-looking, immaterial, accompanied by meaningful cautionary language and because plaintiffs have failed to allege that defendants had actual knowledge of falsity.

A.   Forward-Looking Statements

Defendants contend that the challenged statements about Aetna's disciplined pricing policy are forward-looking.[7]

_____

[6]  This statement is from Aetna's 2005 Form 10-K and, in the context, specifically relates to the MCRs for the years 2003 through 2005 which plaintiff does not allege to be false or misleading.  I will thus not consider this statement.

[7]  The term "forward-looking statement" means:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

Plaintiff and defendants agree that Aetna specifically defined "disciplined" to mean Aetna's expectation of "achieving premium yields that are in line with our medical cost trend." These premiums are fixed when they are issued or renewed, so, with that definition, pricing is disciplined to the extent that premiums are in line with the medical costs paid over the terms of the policies. "Disciplined pricing" means that Aetna expects that its pricing will be in line with its projected medical cost trend, a specific measurement of future performance. Thus, in context, the "disciplined pricing" statements fall within the PSLRA's definition of a forward-looking statement as a "statement of future performance" and "a statement of the plans and objectives of management for future operations, including plans or objective relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B) and (C).

Plaintiff alleges that the statements are wholly or partly statements of historical fact and that statements addressing continuation of the disciplined pricing policy, including phrases like "remains consistent," "is unchanged" and "we continue to adhere to" are partly historical and partly present tense. Defendants properly note that the fact that a statement is phrased in the present tense does not mean that it is not forward-looking. See GSC Partners CDO Fund v. Washington, 368 F.3d 228, 241-42 (3d. Cir. 2004). The Court of Appeals has noted that while "a mixed present/future statement is not entitled to the safe harbor with respect to the part of the

---

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

statement that refers to the present" Avaya, 2009 WL 1151943, at *9, citing Makor Issues &
Rights, Ltd. v. Tellabs Inc. (Tellabs II), 513 F.3d 702, 705 (7th Cir. 2008), some assertions of a
company's current situation "cannot meaningfully be distinguished from the future projection of
which they are a part" and that statements that say only that "whatever the situation, it makes the
future projection attainable [are] necessarily implicit in every future projection." Avaya, 2009
WL 1151943, at *9, noting that Tellabs II involved a specific assertion about the state of sales
that could be distinguished from future projections.

    The statements alleged to be misleading here are that the pricing during the class period is
disciplined and will make the future projection attainable.  Statements about how Aetna has
always had a disciplined pricing policy are not at issue because these statements are not alleged
to be fraudulent for the time period prior to the class period.  Additionally, some of these
statements include phrases like "as best we can" and "we believe," implying that they are hopeful
statements about the future.  Given defendants' definition of "disciplined" and the context in
which these statements were made, these statements are forward-looking and are thus eligible to
be protected under the PSLRA's safe harbor under any of the provisions's criteria.  See In re
ATI, 216 F. Supp.2d at 429.

    Plaintiff also claims that it is not complaining exclusively or even principally about
Aetna's projections or estimates but rather that defendants falsely stated that Aetna's pricing was
"disciplined" and that they failed to disclose historical and existing material facts about Aetna's
alleged under-pricing.  This assertion presupposes the truth of the claim that Aetna was
underpricing and is contradicted by statements in the consolidated complaint.  Additionally,
"non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the

defendant had an affirmative duty to disclose that information," such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure." Oran v. Stafford, 226 F.3d 275, 285-86 (3d Cir. 2000). "There is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading." In re Aetna, Inc. Sec. Litig., 34 F. Supp.2d 935, 948 (E.D. Pa. 1999). In order to make false statements or intentionally fail to disclose information, defendants would have to have actual knowledge that under-pricing was occurring. However, as explained more fully below, plaintiff has failed to allege that defendants had actual knowledge.

Specifically, plaintiff argues that, having chosen to speak about Aetna's disciplined pricing policy and its effects on MCR, defendants were obligated to inform shareholders of Aetna's allegedly deliberate under-pricing. Plaintiff focuses on SEC filings in establishing the obligation. Federal regulations strictly govern what must be included in documents filed with the SEC. Specifically, Regulation S-K provides, in part, that annual and period reports must contain a section entitled "Management's discussion and analysis of financial condition and results of operations." See 17 C.F.R. 5 229.10, et seq. Items 303 of Regulation S-K, 17 C.F.R. § 229.303, governs what must be contained in that section, including any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. However, the Court of Appeals has held that, even if defendants had violated SK-303, "violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5." Oran, 226 F.3d at 288. As plaintiff has failed to plead any actionable misrepresentation or omission under 10b-5, SK-303 alone does not provide a basis for liability.

As the challenged statements are forward-looking, I may look to whether they are protected by the PSLRA's safe harbor provisions by being immaterial and/or accompanied by meaningful cautionary statements and/or that plaintiff has failed to allege that defendants had actual knowledge of the statements' falsity.  15 U.S.C. § 78u-5(c)(1).

B.   Immateriality

Defendants contend that the forward-looking statements about Aetna's disciplined pricing are protected by the PSLRA's safe harbor provisions because they are immaterial.  To state a valid securities fraud claim under Rule 10b-5, a plaintiff must establish that defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading."  In re Burlington, 114 F.3d at 1417; see also In re Rockefeller, 311 F.3d at 211, asserting that Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material."  A fact is "material" only where "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public.  TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976).  "[A]ccurate report[ing] of past successes does not contain an implicit representation that the trend is going to continue" and therefore does not constitute a material misrepresentation.  In re Burlington, 114 F.3d at 1432; see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538-39 (3d Cir. 1999), holding that accurate reports of earnings and past financial successes are not material misrepresentations, abrogated on other grounds by Avaya, 2009 WL 1151943.

"Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism,

which 'constitute no more than "puffery" and are understood by reasonable investors as such.'"
EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000), quoting In re Advanta,
180 F.3d at 538, noting that "[s]uch statements, even if arguably misleading, do not give rise to a
federal securities claim because they are not material . . . ."  The Court of Appeals has defined
puffery as "vague and general statements of optimism . . . understood by reasonable investors as
such."  In re Advanta, 180 F.3d at 538; In re Burlington, 114 F.3d at 1428, n.14.  "Statements of
subjective analysis or extrapolations, such as opinions, motives and intentions" or other types of
"soft information" are not actionable because investors do not rely on it in making decisions.  In
re Advanta, 180 F.3d at 539.  The context in which optimistic statements are made is critical to
the distinction between misrepresentation and puffery.  In re Lucent Technologies, Inc. Sec.
Litig., 217 F. Supp.2d 529, 559 (D. N.J. 2002).  In general, the more the statement diverges from
known facts about the entity or the more precise and concrete the statement, the less likely courts
have been to dismiss the statement as inactionable puffery.  Payne v. DeLuca, 433 F. Supp.2d
547, 560-62 (W.D. Pa. 2006), citing Southland Sec. Corp. v. Inspire Ins. Solutions Inc., 365 F.3d
353, 372 (5th Cir. 2004).

The source of the comment also plays a role in determining if general statements of
optimism are actionable; statements of opinion by top corporate officials may be actionable if
they are made without a reasonable basis.  Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083,
1099 (1991).  The Court distinguished such statements from ordinary, unattributed expressions of
optimism because such statements "can be materially significant to investors because investors
know that these top officials have knowledge and expertise far exceeding that of the ordinary
investor."  In re Burlington, 114 F.3d at 1428, citing Virginia Bankshares, 501 U.S. at 1090-91.

I find that these statements that Aetna was committed to "disciplined pricing" to be corporate puffery similar to a company's "risk-adjusted pricing strategy," In re Advanta, 180 F.3d at 537; a statement that a company is "pursuing transactions on a selective and disciplined basis," In re The Loewen Group Inc., Sec. Litig., 2003 WL 22436233, at *4 (E.D. Pa. July 16, 2003), and a statement that a company is "on track" to meet a specific goal, Avaya, 2009 WL 1151943, at *8.  Indeed, the facts alleged here are nearly identical to those alleged in In re Advanta:  the plaintiffs alleged that Advanta made introductory offers to new credit card customers at below-market rates to gain market share and did not inform investors of the risks that the new, riskier customers might default at higher-than-expected rates.  In re Advanta, 180 F.3d at 528.  The plaintiffs claimed that Advanta's statement that it had a risk-adjusted pricing policy was false and misleading and caused a drop in Advanta's stock price.  Id. at 537.  Here, plaintiff alleges that Aetna under-priced new policies in order to gain market share and did not inform investors of the risks of this policy and that Aetna's statements that it had a "disciplined pricing" policy were false and misleading and caused a drop in Aetna's stock price.  While plaintiff counters that, in another case, a company's statement that it engaged in "disciplined underwriting" was held to be material, in that case the company was under-pricing its insurance policies at rates between 70 and 90% of market rates and was effectively not underwriting at all.  In re PMA Capital Corp. Sec. Litig., 2005 WL 1806503, at *17 (E.D. Pa. July 27, 2005).  Here, however, parties are arguing whether Aetna's pricing can be properly termed "disciplined," which is far more analogous to In re Advanta than In re Capital Corp.  I therefore find these statements to be immaterial and not actionable because they are puffery, vague and non-specific expressions of corporate optimism on which reasonable investors would not have relied.

C.    Meaningful Cautionary Statements

Additionally, even if these forward-looking statements were not immaterial, they would be protected by the PSLRA's safe harbor because each statement was accompanied by meaningful cautionary statements.  The PSLRA requires forward-looking statements to be accompanied by "meaningful cautionary statements" in order for safe harbor protection to apply. Whether a cautionary statement is sufficient to alert investors to the risks involved in a forward looking statement depends on the statement as a whole.  In re Administaff, Inc. Sec. Litig., 2006 WL 846378, at *7 (S.D. Tex. Mar. 7, 2006).  A corporation need not provide every detail of a potential risk to qualify for safe harbor treatment; instead, it need only provide sufficient detail to make investors aware of the source, magnitude and certainty of the contemplated risk.  Id.  The cautionary language should be "directly related to the alleged misrepresentations," but it need not "actually accompany the alleged misrepresentation."  GSC Partners CDO Fund, 368 F.3d at 242-43, quoting EP Medsystems, 235 F.3d at 874, referring to the "bespeaks caution" doctrine which, like the safe harbor provision, protects forward-looking statements accompanied by meaningful cautionary statements from liability.  Cautionary language must be "extensive and specific." Avaya, 2009 WL 1151943, at *10, quoting GSC Partners CDO Fund, 368 F.3d at 243 n.3, internal citations omitted.  "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  Id.

As was the case in Avaya, defendants' "cautionary language here was extensive and specific."  Avaya, 2009 WL 1151943, at *10.  In each of the communications in which plaintiff

alleges that fraudulent or misleadings statements were made, Aetna included a substantial cautionary statement that the document or call would include forward-looking information and warned that the market created specific, named risk factors that could affect outcomes.  While plaintiff argues that the cautionary language is too generalized to be adequate, defendants provided substantial and meaningful cautionary language to warn of "important risk factors" by noting specifically that profitability could be affected by Aetna's "ability to forecast . . . costs" and that "there can be no assurance regarding the accuracy of medical cost projections assumed for pricing purposes."  See EP Medsystems, 235 F.3d at 878-79, finding that sales projections were neutralized by statements warning that projections were driven by a number of assumptions and could be revised.  This language is specific and "directly address[ed] the substance of the statement the plaintiff[] challenge[s]."  See In re Donald J. Trump Casino Sec. Litig., 7 F.3d 257, 372 (3d. Cir. 1993).  Thus, I find that even were the statements not immaterial they would be protected as forward-looking statements accompanied by meaningful cautionary language.

      D.    Actual Knowledge of Falsity

      Defendants also argue that plaintiff has failed to plead that defendants acted with actual knowledge of statement's falsity and that plaintiff has only pled that defendants must have known about under-pricing.  While there is still uncertainty as to whether a forward-looking statement protected by the PSLRA safe harbor for immateriality or cautionary statements is protected if plaintiff pleads that defendants had actual knowledge of falsity, it is clear that if plaintiff has "not sufficiently pleaded a strong inference that defendants acted with actual knowledge that their projections were false or misleading," forward-looking statements accompanied by meaningful cautionary statements or found to be immaterial are protected by the

PSLRA's safe harbor.  <u>Avaya</u>, 2009 WL 1151943, at *12.  This is a higher standard than that required for scienter.  <u>Id</u>. at *12 n.29.  "[I]t is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."  <u>GSC Partners CDO Fund</u>, 368 F.3d at 239.

     Plaintiff alleges that defendants were aware that analysts and investors focus on pricing and MCR more than on any other metric and that the market's knowledge of under-pricing would have a negative effect on Aetna's stock price.  Plaintiff further alleges that, as hands-on managers with ample tools in place to detect under-pricing, they knew that getting the disclosures on pricing and MCR right was the most important Aetna disclosure and that they had the resources in place to do it.  This is not an assertion of actual knowledge; it asserts merely that defendants should have known, or indeed could have known, about under-pricing.  Plaintiff also notes that, regarding the allegations from the confidential witnesses, the complaint "does not seek to impute the CW's knowledge to the individual defendants, but rather illustrates the recklessness of supposedly hands-on senior managers who failed to ascertain what employees in several regions of the country clearly knew - that Aetna was under-pricing."  Because earnings statements and projections are built on many different factors, "[t]he mere fact that a defendant made a statement about earnings, therefore, does not necessarily imply he would have been aware of particular pricing developments," even one alleged to be the most important factor.  <u>Avaya</u>, 2009 WL 1151943, at *20.  Thus, plaintiff has also failed to allege defendants' actual knowledge of the purported "under-pricing."

     Thus, I find that plaintiff fails to state an actionable claim of a misstatement or omission to constitute fraud under 10b-5 because the alleged misstatements are forward-looking and

protected by the PSLRA's safe harbor as immaterial, accompanied by meaningful cautionary statements and plaintiff fails to allege actual knowledge of falsity.[8]

II.    Section 18 Claim

Plaintiff asserts a claim for relief under § 18 of the Exchange Act against defendants for their alleged negligence in connection with allegedly deceiving the investing public, including plaintiff and the class, artificially inflating and maintaining the market prices of Aetna's securities and causing plaintiff and the class to purchase or otherwise acquire Aetna's securities at artificially low prices by making untrue statements of material fact and/or omitting to state material facts necessary to make the statements made not misleading and/or substantially participating in creation of the alleged misrepresentations.  Section 18 creates a private remedy for damages resulting from the purchase or sale of a security in reliance upon a false or misleading statement contained in any document or report filed with the SEC pursuant to the Exchange Act.  15 U.S.C. § 78r(a).[9]  Plaintiff concedes that to state its claim under § 18, it is

---

[8]  Because I will grant defendants' motion to dismiss on other grounds, I need not consider defendants' arguments that plaintiff relied on group pleading, failed to allege scienter adequately, failed to allege fraud with particularity and failed to plead loss causation adequately.

[9]  Section 78r(a) provides in relevant part:

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78(o) of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading.

required to plead actual, as opposed to presumed, reliance upon a false or misleading statement. See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 283 (3d Cir. 2006).  A § 18 plaintiff, however, bears no burden of proving that the defendant acted with scienter or any particular state of mind.  Id. at 283, noting that the Court of Appeals has not yet determined whether Rule 9(b)'s heightened pleading requirements apply to a § 18 claim.

Defendants argue that the § 18 claim must be dismissed because it is time-barred and fails to state a claim upon which relief can be granted.  The parties do not dispute that a § 18 claim must be brought "within one year after the discovery of the facts constituting the cause of action," see 15 U.S.C. § 78r(c), which begins to run upon plaintiff's inquiry notice.  In re Merck Securities, Derivative and "ERISA" Litigation, 543 F.3d 150, 160-61 (3d Cir. 2008).

Plaintiff concedes that defendants' July 27, 2006 disclosures put it on inquiry notice. However, plaintiff claims that it was not until it completed a "reasonable investigation" and its representatives made contact with confidential witnesses with inside knowledge of Aetna's pricing policies that it could aver confidently that statements contained in Aetna's SEC filings were false or misleading.  However, "[u]ndergirding the inquiry notice analysis is the assumption that a plaintiff either was or should have been able, in the exercise of reasonable diligence, to file an adequately pled securities fraud complaint as of an earlier date."  Id. at 164, internal citations omitted.  As the Court of Appeals noted:

> Whether the plaintiffs, in the exercise of reasonable diligence, should have known of the basis for their claims depends on whether they had sufficient information of possible wrongdoing to place them on inquiry notice or to excite storm warnings of culpable activity.  This is an objective question; thus, an investor is not on inquiry notice until a reasonable investor of ordinary intelligence would have discovered the information and

---

15 U.S.C. § 78r(a).

recognized it as a storm warning.

Id. at 161, internal citations and quotation marks omitted.  If completion of an investigation were permitted before a plaintiff were on inquiry notice, there would be no difference between inquiry and actual notice under the law.  Thus, plaintiff was correct that it was on inquiry notice as of the disclosures of July 27, 2006 and a timely Section 18 filing should have been made by July 27, 2007.  As plaintiff did not file until October 27, 2007, I therefore find that plaintiff's § 18 claim is time-barred.[10]

III.     Section 20(a) Claim

Section 20(a) of the Exchange Act creates liability for "[e]very person who, directly or indirectly, controls any person liable" for an independent violation of the Exchange Act.  15 U.S.C. § 78t.  Because § 20(a) claims are derivative, "plaintiff cannot maintain a claim under § 20(a) without meeting the pleading requirements for a primary violation of the Act."  In re American Business Financial Services, Inc. Sec. Litig., 413 F. Supp.2d 378, 403 (E.D. Pa. 2005), citing In re Loewen, 2003 WL 22436233, at *19.  Because the consolidated amended complaint fails to establish that there is a substantial likelihood that defendants' allegedly false statements would have been material to a reasonable investor required to pursue a claim under 10b-5, I will also dismiss plaintiff's claims under § 20(a).

An appropriate Order follows.

---

[10]  As I will dismiss the Section 18 claim on other grounds, I need not consider defendants' argument that plaintiff does not adequately plead reliance.

48